J-A23001-25

2025 PA Super 268

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| CORNELL POINTER | : | |
| Appellant | : | No. 1005 WDA 2024 |

Appeal from the Order Entered July 9, 2024
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0004299-2011

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| CORNELL POINTER | : | |
| Appellant | : | No. 1006 WDA 2024 |

Appeal from the PCRA Order Entered August 5, 2024
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0004299-2011

BEFORE: PANELLA, P.J.E., McLAUGHLIN, J., and BENDER, P.J.E.

OPINION BY PANELLA, P.J.E.: **FILED: December 2, 2025**

Cornell Pointer appeals from the order entered by the Allegheny County Court of Common Pleas on August 5, 2024, dismissing Pointer's petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546, as well as the prior order entered on July 9, 2024, in which the court corrected a typographical error from the trial transcript in this matter. In this consolidated appeal, Pointer raises multiple claims of ineffective assistance of

counsel, along with a challenge to the court's post-trial alteration of the trial transcript. After careful review, we affirm.

We previously reiterated the trial court's summary of the factual history of this case on direct appeal as follows:

On February 16, 2011[,] Waishard White wanted to purchase 1–2 pounds of marijuana, and to accomplish that he contacted Elisha Jackson that afternoon to put him in contact with a possible local source/seller of marijuana. Jackson was a woman with whom White had been intimately involved with in the past, and who had also provided him with sources of marijuana prior to that day.

During the late morning and early afternoon, Jackson was with her then current boyfriend, [] Pointer, and his close friend and associate, D'Andre Black, in the Everton area of the City of Pittsburgh. Everton was a small (two building) housing project that was relatively isolated and heavily wooded on all sides. During the early afternoon Pointer and Black drove her to a bus stop so that she could get a bus to downtown Pittsburgh. That afternoon while downtown, Jackson received White's call and she in turn contacted Black, who was still with [Pointer], regarding White's desire to purchase marijuana. Jackson made Black aware of White's desire to buy 1–2 pounds of marijuana and asked Black if she could give White his phone number. Although Black did not have any marijuana to sell, he told Jackson that she could give White his number and he would handle it-that "they were going to get out on them[."]

White and a friend, Jemar Stenhouse, contacted Black, and following a series of phone conversations that late afternoon White and Stenhouse agreed to purchase two pounds of marijuana from Black in Everton for $2,500. Following the final conversation Black turned to Pointer and stated that, "I have a lick [robbery] set up for us[."] Pointer replied, "Let's do it[."]

Since neither Pointer nor Black had any marijuana, they decided to purchase an ounce of marijuana and arrange it in a bag to make it appear to be the two pounds sought by White and Stenhouse. Pointer and Black believed that such a measure was necessary to lure White and Stenhouse out of their car when they arrived in

- 2 -

Everton. They undertook this artifice in the apartment of Jocelyn Simmons, who was a mutual friend of both Pointer and Black. Part of their plan included Pointer arming himself with a firearm, and he left the apartment during this time and returned with an AK–47. Black's role was to get White and Stenhouse out of their car and close to the entrance of the building once they arrived in the Everton complex; Pointer was then to come out of the building with the AK–47, order them to the ground and take their money.

White and Stenhouse arrived in Everton in Stenhouse's vehicle in the early evening and phoned Black, who came outside Simmons' residence and spotted the vehicle. Black waved to White and Stenhouse and in response they parked the vehicle, got out, and approached Black. Black recognized both Stenhouse and White as persons he knew from the Wilkinsburg area, a nearby community. Although he now had some reservations about the robbery, Black nonetheless led them toward the entrance to Simmons' building.

As the three men approached the front door of the building Pointer burst out of the building brandishing the AK–47 and ordered White and Stenhouse to the ground. White immediately turned and ran toward the parked vehicle but was pursued and shot one time by [Pointer], causing him to fall to the ground. Stenhouse then fled in a different direction, only to be pursued and shot by [Pointer]. Stenhouse received a grazing wound to his left chest but managed to escape by diving over a hill and fleeing into the heavily wooded area behind the building. Stenhouse found his way to a nearby street where a woman on her porch allowed him to use her phone. Stenhouse contacted White's brother, Meijour, and told him that Waishard had been shot in Everton. Meijour, along with Waishard's father, drove to Stenhouse's location, picked him up and drove to the Everton complex. However, upon their arrival less than an hour after the shooting, neither Waishard nor the vehicle were there.

The vehicle was gone because Black drove the vehicle away immediately after the incident, leaving it in a shopping center in a neighboring community where it was recovered by Pittsburgh police several hours later. Pittsburgh police were contacted and began an investigation that included an unsuccessful search of the area for White. Two days later, February 18, 2011, two persons walking on a street below Everton observed what they believed to be a body in the woods. Police then discovered White's body near

a path that led through the heavily wooded area behind Everton to the street below.

The autopsy indicated that White died of a single gunshot wound to the arm and trunk. The bullet transected many blood vessels including one major blood vessel, the subscapular artery, and caused contusions of upper and middle lobes of White's lung. The resultant internal bleeding caused cardiovascular collapse and a survivability period of only 10–15 minutes.

*Commonwealth v. Pointer*, 1918 WDA 2014 (Pa. Super. filed Dec. 29, 2015) (unpublished memorandum). As the investigation unfolded, both Pointer and Black were charged by criminal information with one count each of criminal homicide, criminal attempt (homicide), robbery, and criminal conspiracy.

On November 18, 2011, following trial, a jury convicted Pointer of second-degree murder, robbery, and criminal conspiracy. Notably, Black testified at Pointer's trial as part of a plea bargain in which he pled guilty to third-degree murder, robbery, and criminal conspiracy.

On February 16, 2012, the trial court sentenced Pointer to a period of life imprisonment, without the possibility of parole, for the murder conviction, and 5 to 10 years' incarceration on each of the other two convictions, to be served consecutively.

Pointer filed a timely post-sentence motion. On April 2, 2012, he filed a supplemental post-sentence motion, which incorporated the earlier motion and sought, among other things, an evidentiary hearing based upon after-discovered evidence consisting of a letter from his co-conspirator, Black, to Pointer's counsel. The letter included a recantation of the testimony that Black

gave at Pointer's trial. The trial court did not hold a hearing on Pointer's motion, instead allowing it to be denied by operation of law on June 26, 2012.

Pointer filed a timely appeal, challenging the sufficiency and weight of the evidence, along with the court's failure to hold an evidentiary hearing on his after-discovered evidence claim. In an unpublished memorandum decision, this Court found Pointer's sufficiency and weight claims were without merit, but vacated Pointer's judgment of sentence and remanded for the trial court to conduct a hearing on Pointer's motion for a new trial based on after-discovered evidence. **See Commonwealth v. Pointer**, 1154 WDA 2012 (Pa. Super. filed Dec. 9, 2013) (unpublished memorandum).

Prior to the trial court's holding the evidentiary hearing, Pointer filed a motion requesting the trial judge to recuse, which the judge denied that same day. On October 16th and 28th of 2014, the trial court conducted a hearing on Pointer's after-discovered evidence claim, after which the court denied Pointer's motion for a new trial and resentenced him to a term of life imprisonment, without the possibility of parole, for his murder conviction, as well as a concurrent term of 5 to 10 years' incarceration for the offense of conspiracy. Pointer timely appealed, challenging the trial court's refusal to recuse itself as well as the trial court's denial of a new trial based on the after-discovered evidence. We affirmed the judgment sentence, finding both claims without merit. **See Commonwealth v. Pointer**, 1918 WDA 2014 (Pa. Super.

filed Dec. 29, 2015) (unpublished memorandum). The Pennsylvania Supreme Court denied allowance of appeal on July 14, 2016.

In January 2017, Pointer filed, *pro se*, a timely first PCRA petition. Counsel was appointed, and after numerous extensions, filed an amended petition on April 13, 2020, raising multiple claims of ineffective assistance of trial counsel. Specifically, Pointer argued trial counsel was ineffective for (1) failing to raise an issue on direct appeal that the trial court erred in overruling Pointer's objection and permitting the Commonwealth to present improper impeachment testimony in the form of calling Detective Peg Sherwood as a witness to testify as to the credibility of other witnesses; (2) failing to object to the Commonwealth's improper argument during closing argument stressing Detective Sherwood's testimony concerning the credibility of other witnesses; (3) failing to object to the trial court's erroneous jury instruction that the jury should view Black's testimony "with favor" as he was a corrupt and polluted source; and (4) failing to pursue an alibi defense. Finally, Pointer argued he is entitled to a new trial based on after-discovered evidence that Detective Sherwood has been convicted for being a corrupt police officer.

Regarding the claim of an erroneous jury instruction, the Commonwealth responded that "[a]lthough the transcript contains the phrase 'with favor', there is substantial likelihood that the transcript contains an error and that [the trial court] did, in fact, instruct the jury to view Black's testimony with 'disfavor.'" Commonwealth's Answer to PCRA Petition, 9/28/20, at 9. The

Commonwealth argued the instruction had to be considered in its entirety, and that it is unlikely the court instructed the jury to view Black's testimony with "favor" because the statement would be at odds with itself, after the court highlighted why an accomplice might be motivated to lie, and immediately before the court followed up with clear instructions to view the testimony very cautiously and prudently. *See id.* at 10. The Commonwealth alternatively argued that even if the transcript were correct, Pointer failed to prove prejudice because the instruction, when read as a whole, fairly conveyed the legal principle of accomplice testimony to the jury. *See id.* at 10-11. Finally, the Commonwealth requested that if the court found the transcript contained an error, that the court correct the error and dismiss the claim.

On November 3, 2022, the court held a PCRA hearing. Regarding the claim of an erroneous jury instruction, trial counsel testified that from what she could remember, "I believe, I don't think I heard it … it was a fairly long charge, if I recall correctly, and I don't—I don't recall hearing the [c]ourt say 'favor.'" N.T., PCRA Hearing, 11/3/22, at 12. Trial counsel affirmed that if she had heard that word, she would have objected. *See id.* On cross-examination, trial counsel clarified that it is "absolutely" her normal course of conduct to listen while the judge instructs the jury, and that it is her practice to print out the instructions to "read along and stay focused." *Id.* at 16. Trial counsel stated "the possibility is very, very high" that she had the instructions printed out for Pointer's trial, and that she tries "very hard to concentrate and listen"

in the trial judge's courtroom because he "sometimes speaks in a … soft voice." *Id.* at 18. The court concluded the error was a "typo" and that the court reporter had misheard what was actually said. *See id.* at 37-38. Accordingly, following the PCRA hearing, the PCRA court issued an order, giving notice "pursuant to Pa.R.A.P. 1922 and 1926" of its intent to "correct the typographical error contained in the record[,] [] thereby replacing the word 'favor' with 'disfavor'," and giving the parties an opportunity to file a response to the intended change. Pointer filed a response objecting to the change.

On July 9, 2024, the court entered an order correcting the "typographical error", replacing the word "favor" with "disfavor". On the same day, the court issued notice of its intent to dismiss the petition pursuant to Pa.R.Crim.P. 907.

On August 5, 2024, the court entered an order dismissing Pointer's PCRA petition. Pointer filed timely notices of appeal from both orders. This Court subsequently granted consolidation of the appeals.

Pointer raises the following issues on appeal:

1. Whether the trial court erred and/or abused its discretion when [the court] altered a word in the [trial] transcript over a decade later?

2. Whether trial counsel provided ineffective assistance of counsel for failing to object to the trial court's erroneous jury instruction that the jury should view the co-defendant[, Black,] "with favor" as he was a corrupt and polluted source?

3. Whether appellate counsel provided ineffective assistance of counsel by failing to raise the issue to this Honorable Court that the trial court erred in overruling appellant's objection and permitting the Commonwealth to present improper impeachment testimony?

4. Whether trial counsel provided ineffective assistance of counsel by failing to object to the Commonwealth's improper closing argument?

Appellant's Brief, at 5 (answers and unnecessary capitalization omitted).

In his first issue, Pointer argues the trial court abused its discretion when it altered a word in the trial transcript, contending the court has no power to alter the transcript years later. The challenged portion of the trial transcript read: "You should view the testimony of an accomplice with **favor** because it comes from a corrupt and polluted source." N.T., Jury Trial, Volume II, 11/17/11, at 161-162 (emphasis added). In its July 9, 2024 order, the court corrected the word "favor" to read "disfavor" instead.

Our Supreme Court has explained that litigants have "procedures provided by our Rules of Criminal and Appellate Procedure for the correction of … errors" in the record. ***Commonwealth v. Montalvo***, 244 A.3d 359, 366 (Pa. 2021). Prior to taking an appeal, our rules of criminal procedure allow a party to "correct" the transcript:

> At any time before an appeal is taken the transcript may be corrected, and the record may be corrected or modified, in the same manner as is provided by Rules 1922(c) and 1926 of the Pennsylvania Rules of Appellate Procedure.

Pa.R.Crim.P. Rule 115(C). The comment to Rule 115 notes that "Paragraph (C) provides a method for correcting transcripts and correcting or modifying

the record before appeal by incorporating Pa.R.A.P. 1922(c) and Pa.R.A.P. 1926, which otherwise apply only **after an appeal has been taken**." *Id.* at cmt (emphasis added).

After taking an appeal, a party may use the procedures set forth in our rules of appellate procedure to "correct" or "modify' the record. Rule 1922 of the Pennsylvania Rules of Appellate Procedure sets forth the procedure to be followed in the event a party objects to a transcript as lodged:

> **(c) Corrections to transcript.** If a transcript contains an error or is an incomplete representation of the proceedings, the omission or misstatement may be corrected by the following means:
>
> (1) *By objection.* A party may file a written objection to the filed transcript. Any party may answer the objection. The trial court shall resolve the objections and then direct that the transcript as corrected be made a part of the record and transmitted to the appellate court.
>
> (2) *By stipulation of the parties filed in the trial court.* If the trial court clerk has already certified the record, the parties shall file in the appellate court a copy of any stipulation filed pursuant to this rule, and the trial court shall direct that the transcript as corrected be made a part of the record and transmitted to the appellate court.
>
> (3) By the trial court or, if the record has already been transmitted to the appellate court, by the appellate court or trial court on remand, with notice to all parties and an opportunity to respond.

Pa.R.A.P., Rule 1922.

Rule 1926 of the Pennsylvania Rules of Appellate Procedure sets forth the procedures to be followed to correct a record:

> (a) If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted

to and settled by that court after notice to the parties and opportunity for objection, and the record made to conform to the truth.

(b) If anything material to a party is omitted from the record by error, breakdown in processes of the court, or accident or is misstated therein, the omission or misstatement may be corrected by the following means:

(1) by the trial court or the appellate court upon application or on its own initiative at any time; in the event of correction or modification by the trial court, that court shall direct that a supplemental record be certified and transmitted if necessary; or

(2) by the parties by stipulation filed in the trial court, in which case, if the trial court clerk has already certified the record, the parties shall file in the appellate court a copy of any stipulation filed pursuant to this rule, and the trial court clerk shall certify and transmit as a supplemental record the materials described in the stipulation.

(c) The trial court clerk shall transmit any supplemental record required by this rule within 14 days of the order or stipulation that requires it.

(d) All other questions as to the form and content of the record shall be presented to the appellate court.

Pa.R.A.P., Rule 1926. These Rules set forth the proper procedures that must be followed in order to correct alleged discrepancies in the record.

Pointer argues that the versions of the above rules that should be applied to this case are the versions that were effective on the date the transcripts were initially ordered and filed, which was on September 14, 2012. We find that under either version of these rules, Pointer is incorrect that "[t]hese rules, together, impose a time limitation for objections to be waged"

and "prevent the trial court from correcting an error after a direct appeal."

Appellant's Brief, at 23.

> The prior version of Rule 1922, effective as of April 26, 2001, stated:
>
> a) General rule. Upon receipt of the order for transcript and any required deposit to secure the payment of transcript fees the official court reporter shall proceed to have his notes transcribed, and not later than 14 days after receipt of such order and any required deposit shall lodge the transcript (with proof of service of notice of such lodgment on all parties to the matter) with the clerk of the trial court. Such notice by the court reporter shall state that if no objections are made to the text of the transcript within five days after such notice, the transcript will become a part of the record. If objections are made the difference shall be submitted to and settled by the trial court. The trial court or the appellate court may on application or upon its own motion shorten the time prescribed in this subdivision.
>
> …
>
> (c) Certification and filing. The trial judge shall examine any part of the transcript as to which an objection is made pursuant to Subdivision (a) of this rule or which contains the charge to the jury in a criminal proceeding, and may examine any other part of the transcript, and after such examination and notice to the parties and opportunity for objection (unless previously given) shall correct such transcript. If the trial judge examines any portion of the transcript, he shall certify thereon, by reference to the page and line numbers or the equivalent, which portions thereof he has read and corrected. If no objections are filed to the transcript as lodged, or after any differences have been settled or other corrections have been made by the court, the official court reporter shall certify the transcript, and cause it to be filed with the clerk of the lower court.

Pa.R.A.P., Rule 1922 (effective April 26, 2001 through June 24, 2019).

Accordingly, the prior version of Rule 1922 differs from the current version of

the rule, in that it only allowed for corrections to be made by objection after

notice of the lodging of the transcription with the clerk of court, and imposed a time limit on such objections of 5 days.

Notably, Pointer does not include the actual language of the prior version of Rule 1926, which actually deals exclusively with correction or modification of the record, and reads as follows:

> If any difference arises as to whether the record truly discloses what occurred in the lower court, the difference shall be submitted to and settled by that court after notice to the parties and opportunity for objection, and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the lower court either before or after the record is transmitted to the appellate court, or the appellate court, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the appellate court.

*See* Pa.R.A.P. 1926 (effective December 30, 1978 through May 9, 2013). Pointer did cite a note from the prior version of this rule, which clarifies that the purpose of Rule 1926 is to postpone the reading and correction by the trial judge of a transcript until the opinion writing stage, if the transcript was not already objected to during the time allowed by Rule 1922. *See* Pa.R.A.P. 1926, Note (effective December 30, 1978 through May 9, 2013).

Accordingly, even if we were to apply the former versions of these rules, Rule 1926 allowed a party to submit a request, after certification of the record, to correct a difference in the record from what actually occurred. Neither

version of Rule 1926 imposes any specific time bar on submitting a "difference" to a court to settle, only on which court to submit the difference.

Pointer cites to **Montalvo**, for the proposition that "the court does not have the ability to retroactively correct erroneous jury instructions by labeling them as typographical errors." **See** Appellant's Brief, at 24. **Montalvo** does not hold as such, and in any event, Pointer's reliance on **Montalvo** is in error, as the instant case is distinguishable.

During the guilt phase of Montalvo's trial, the trial court instructed the jury as follows: "So if the Commonwealth has not sustained it's (sic) burden to that level, the burden of proving the Defendant guilty beyond a reasonable doubt, then your verdict must be guilty." **Montalvo**, 244 A.3d at 364 (citation omitted). The court further compounded this misstatement of the law by repeating it again later in its charge. **See id.** The **Montalvo** Court emphasized that this portion of the jury instruction was indisputably incorrect. **See id.** The jury ultimately convicted Montalvo of first-degree murder and sentenced him to death.

Montalvo eventually filed a PCRA petition, claiming his trial counsel was ineffective for failing to object to the manner in which the trial court instructed the jury on the issue of Montalvo's guilt. The PCRA court agreed and granted Montalvo a new trial. The Commonwealth appealed the PCRA court's grant of a new guilt-phase trial, arguing, in pertinent part, that it was unknown

whether the trial court actually misspoke when instructing the jury, or whether the court reporter made a typographical error. ***See id.*** at 365.

The ***Montalvo*** Court found the Commonwealth's arguments unpersuasive, stating:

> First, with respect to the Commonwealth's novel suggestion that the erroneous statement by the trial court may not actually have been a misstatement, but a typographical error by the court reporter, had the Commonwealth genuinely believed that the stenographer made a typographical error in transcribing the record, it could have utilized the procedures provided by our Rules of Criminal and Appellate Procedure for the correction of such errors. *See* Pa.R.Crim.P 115 (c) (at any time before an appeal is taken, the court may correct or modify the record in the same manner as provided by Rule 1926 of the Pennsylvania Rules of Appellate Procedure); Pa.R.A.P. 1926 ("If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by that court after notice to the parties and opportunity for objection, and the record made to conform to the truth."). ***As the Commonwealth did not avail itself of this procedure, we reject its eleventh-hour assertion that the transcript may be incorrect***.

***Id.*** at 366 (emphasis added). Accordingly, no party requested that the transcript be corrected at any point in time, and the trial court did not do so on its own accord.

Here, the PCRA court, who was also the trial court in this matter, properly followed the procedures outlined in either version of Rules 1922 and Rule 1926 to correct the error−the court found an error had been made based on testimony from the PCRA hearing and its own findings; the court sought to correct the error; it properly gave notice of its intent to do so; it further gave the parties an opportunity to object; and after careful consideration, the court

ordered the transcript to be corrected to reflect what it found to have actually occurred in court. As the court followed the language of these rules, we cannot say the court abused its discretion in correcting the transcript. Accordingly, Pointer's challenge to the court's July 9, 2024 order is without merit.

The remainder of Pointer's issues pertain to the court's denial of his PCRA petition. We therefore begin with our scope and standard of review regarding the denial of a PCRA petition.

> We consider the record in the light most favorable to the prevailing party at the PCRA level. This review is limited to the evidence of record and the factual findings of the PCRA court. We afford great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. Accordingly, as long as the PCRA court's ruling is free of legal error and is supported by record evidence, we will not disturb its ruling. Nonetheless, where the issue pertains to a question of law, our standard of review is de novo and our scope of review is plenary.

***Commonwealth v. Pander***, 100 A.3d 626, 630 (Pa. Super. 2014) (en banc) (quotation marks, italics, and citations omitted).

> Pointer's PCRA claims assert the ineffective assistance of counsel.

> Counsel is presumed to have rendered effective assistance. To establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

- 16 -

***Commonwealth v. Washington***, 269 A.3d 1255, 1263 (Pa. Super. 2022) (en banc) (brackets and citations omitted; some formatting provided).

Pointer first argues trial counsel was ineffective for failing to object to the trial court's erroneous jury instruction that the jury should view co-defendant Black's testimony "with favor," as he was a corrupt and polluted source. Due to our disposition above, there would have been no cause for trial counsel to object to the jury instruction, as the record has been corrected to reflect that the court actually properly instructed the jury to view Black's testimony with "disfavor". Accordingly, there was no reason for trial counsel to have objected to the instruction.

However, even if the court had misspoken by stating "favor" instead of "disfavor", we do not find this error alone would require a new trial. Pointer contends this Court has held "simply adding one, incorrect word to a jury instruction can result in a new trial." Appellant's Brief, at 28 (citing to ***Commonwealth v. H.D.***, 217 A.3d 880 (Pa. Super. 2019)). Pointer has severely oversimplified what occurred there.

In ***H.D.***, prior to trial, the Commonwealth presented a motion *in limine* to the trial court, requesting the court add a reasonableness standard to the jury instruction for the statutory defense to the charge of interference with custody of children, as provided in 18 Pa.C.S.A. § 2904(b)(1). ***See H.D.***, 217 A.3d at 885. Defense counsel objected, arguing the statute was clear on its face, without any mention of reasonableness. ***See id.*** The court later decided

to include the suggested reasonableness language, instructing "[if] you find the defendant ***reasonably*** believed that [the child's] welfare was in imminent danger, you must find the defendant not guilty." ***Id.*** In challenging the jury instruction as given, the issue presented to this Court boiled down to

> whether the Commonwealth was required to prove, beyond a reasonable doubt, that Appellant did not subjectively believe she was protecting the safety of the child. Appellant argues that the Commonwealth was. Conversely, the Commonwealth argues, and the trial court instructed the jury, that the Commonwealth was merely required to prove, beyond a reasonable doubt, that Appellant's subjective belief was unreasonable.

***Id.*** at 886. Finding the jury was clearly confused, based on questions submitted to the court for clarification about what "reasonable belief" meant, this Court held that "[b]ecause the jury was directed to evaluate the criteria of the defense provided in 18 Pa.C.S.A. § 2904(b)(1) with an incorrect standard, prejudice has been established and a new trial is necessary." ***Id.*** at 887-88. ***See*** Appellant's Brief, at 29. Rather than "simply adding one, incorrect word," the trial judge in ***H.D.*** added an entirely incorrect standard of review to the jury instruction.

What we can take from ***H.D.***, is that "[i]n reviewing a challenged jury instruction, we must review the charge **as a whole** and **not simply isolated portions**." ***Id.*** at 885 (emphases added).

> This way we can ascertain whether the charge fairly conveyed the required legal principles that were at issue. A jury instruction will be upheld if it clearly, adequately, and accurately reflects the law.

- 18 -

***H.D.***, 217 A.3d at 885-86. Further, "[a] charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error." ***Commonwealth v. Sandusky***, 77 A.3d 663, 667 (Pa. Super. 2013) (citation omitted).

Here, assuming arguendo that the court used the word, "favor," instead of "disfavor," the charge as a whole read as follows:

> I'm going to define a term for you. Accomplice. A person is an accomplice of another person in the commission of a crime if he has the intent of promoting or facilitating the commission of a crime or solicits the other person to commit it or aids or agrees or attempts to aid the other person planning or committing the crime.
>
> Put simply, an accomplice is a person who knowingly and voluntarily cooperates or aids another person in committing an offense. When a Commonwealth witness is an accomplice, his testimony has to be judged by special precautionary rules.
>
> Experience shows that an accomplice, when caught, they often try to place the blame falsely on somebody else. He may testify falsely in the hope of obtaining favorable treatment or for some corrupt or wicked motive. On the other hand, an accomplice may be a perfectly truthful witness.
>
> These special rules that I give you are meant to help you to distinguish between truthful and false accomplice testimony.
>
> In view of the evidence in this case and the testimony of [] Black himself, you must regard him as an accomplice in the crime of robbery charge and apply the special rules to his testimony. The special rules are as follows: You should view the testimony of an accomplice with favor because it comes from a corrupt and polluted source.
>
> Second, you should examine the testimony of an accomplice closely and accept it only with care and caution.

Third, you should consider whether the testimony of an accomplice is supported in whole or in part by other evidence in this case.

Accomplice testimony is more dependable if supported by independent evidence. However, even if there is no independent supporting evidence, you may still find the defendant guilty solely on the basis of accomplice testimony if, after using the rules I've just given you, you are satisfied beyond a reasonable doubt that the accomplice testified truthfully that the defendant is guilty.

N.T., Jury Trial, Volume II, 11/17/11, at 160-62. The majority of the jury instruction clearly conveyed the correct charge—that the accomplice's testimony should be viewed with caution. We cannot say the jury instruction did not accurately reflect the law, even if the judge had misspoken and stated "favor" instead of "disfavor" one time. That one word would not have made any sense when read in conjunction with the remainder of that very sentence, let alone in conjunction with the remainder of the charge as a whole. **Compare** **H.D.**, 217 A.3d 880 (where the one word at issue was not clearly incorrect when read with the rest of the instruction, and had the effect of changing the context of the entire charge, adding an entirely new standard of review for the jury.).

A thorough review of the entirety of the jury instruction leaves no doubt that the jury was properly, clearly, and adequately advised as to how they should consider Black's testimony. Even if the trial court had misspoken, which is clearly denied by the trial court, any confusion the jury may have had was corrected by the trial court's clear and complete instruction quoted above. **See** **Commonwealth v. Eichinger**, 108 A.3d 821, 845 (Pa. 2014). We find no

error in the jury instruction as a whole. Therefore, trial counsel had no basis to object. Accordingly, this claim has no merit.

Next, Pointer argues his appellate counsel provided ineffective assistance of counsel by failing to raise the issue, on direct appeal, that the trial court erred in overruling Pointer's objection and permitting the Commonwealth to present improper impeachment testimony.

Relevantly, on the second day of trial, just prior to Detective Sherwood testifying for the Commonwealth, defense counsel lodged an objection to part of Detective Sherwood's anticipated testimony. *See* N.T., Jury Trial Volume II, 11/17/11, at 3. Specifically, defense counsel anticipated that the Commonwealth was going to elicit testimony from Detective Sherwood that three civilian witnesses who had testified on the first day of trial were uncooperative and canceled or did not appear for interviews. *See id.* Defense counsel objected based on the belief that this testimony was "improper form, impeachment, and not relevant as to the facts of this case." *Id.* at 3. The trial court overruled the objection. *See id.*

In relevant part, the following exchange then took place during direct examination of Detective Sherwood:

> [Commonwealth:] I want to ask you whether you are familiar with Elisha Jackson, India Thomas, as well as Jocelyn Simmons?
>
> [Detective Sherwood:] Yes. I'm familiar with all three.
>
> [Commonwealth:] What level of contact would you say you've had with those three women?

[Detective Sherwood:] I've attempted to contact all three of those women several times. Within the first week of Waishard being killed, I obviously had contact with them several times. Since then, the phone numbers changed, addresses have changed. I've attempted to contact them through family to get them to come to court or to meet with you and I for a pretrial conference, and they weren't extremely cooperative.

It got to the point where I had to explain to them that a material witness warrant—what it was, first of all, and they could be issued to have them brought into court on a warrant if they weren't willing to come in on their own.

[Commonwealth:] Did I ask you to set up appointments with each of the three of these women …

[Detective Sherwood:] You did.

[Commonwealth:] If you can tell the jurors how many times were appointments set up with these women that they did not show for the appointment?

[Detective Sherwood:] I think we did have the most difficult time with Jocelyn. She didn't show three times. And Elisha would show, but wasn't very cooperative in speaking with us. She would come in, but wouldn't talk to us. India was very difficult also. She didn't show twice.

[Commonwealth:] You indicated you explained to those women what a material witness warrant was. Could you explain to the jurors what that is?

[Detective Sherwood:] When someone is needed in trial and they are subpoenaed and it's obvious that they are avoiding coming in or avoiding being served with a subpoena or you serve a subpoena and they don't show up, the Court can then issue a material witness warrant where the country and the City of Pittsburgh police have the right to pick that person up and house them at the county jail until they are needed in court.

[Commonwealth:] Was that process explained to all three of these women with myself present, as well as you?

[Detective Sherwood:] Yes.

*Id.* at 11-13. On cross-examination, after a line of questioning regarding whether it was common for witnesses to have to be contacted more than once, or for witnesses to change their phone numbers and addresses, Detective Sherwood clarified "This is not what was occurring on this case. The people were avoiding me … They were definitely avoiding me." *Id.* at 18.

Notably, appellate counsel did raise this issue in the concise statement filed on direct appeal. *See* Concise Statement, 10/5/12, at 5 (arguing the trial court erred in overruling the objection to Detective Sherwood's testimony, stating the line of questioning was "improper impeachment, improper bolstering of the testimony of Black, irrelevant, and unduly prejudicial …"). The trial court considered the issue in its 1925(a) opinion, however, appellate counsel did not end up pursuing or developing this claim in the appellate brief. Appellate counsel testified that he had preserved the issue in the concise statement, but "[u]ltimately [] decided the three other issues were meritorious and this one was not." N.T., PCRA Hearing, 11/3/22, at 6-7.

Our Court has recognized that

> [c]laims involving appellate counsel ineffectiveness … involve concerns unique to appellate practice. Arguably meritorious claims may be omitted in favor of pursuing claims which, in the exercise of appellate counsel's objectively reasonable professional judgment, offer a greater prospect of securing relief. Appellate counsel need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal. This process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.

- 23 -

*Commonwealth v. Lambert*, 797 A.2d 232, 244 (Pa. 2001) (internal citations, quotation marks, brackets, ellipses, and footnote omitted).

Here, the PCRA court concluded that Pointer's underlying claim lacked arguable merit:

> [Pointer] contends that this testimony was improper as it went to [the witnesses'] credibility, was cumulative, and prejudicial. However, [Pointer]'s argument is misplaced as Detective Sherwood never opined as to their credibility nor was the testimony cumulative or improper based upon a review of the record. As such, this claim is meritless, and counsel cannot be deemed ineffective for failing to raise meritless claims.

Rule 907 Notice, 7/9/23, at 3 (citation omitted). After our own review of the record, we agree that had appellate counsel challenged Detective Sherwood's testimony on appeal, there is little likelihood that he would have prevailed.

> [T]his Court has held that lay witnesses are [] precluded from offering testimony that would bolster a witness's credibility. [*See*] *Commonwealth v. Yockey*, 158 A.3d 1246, 1255-56 (Pa. Super. 2017); [*see also*] *Commonwealth v. McClure*, 144 A.3d 970, 977 (Pa. Super. 2016). Such lay witness bolstering is particularly problematic in cases where the lay witness is testifying in a professional capacity, which could provide an "'unwarranted appearance of authority in the subject of credibility,' something ordinary jurors are able to assess." *McClure*, 144 A.3d at 977 (citation omitted) (police detective's testimony that he did not believe defendant-daycare worker's explanation for child's injuries was improper bolstering); *Commonwealth v. Loner*, 609 A.2d 1376, 1377 (Pa. Super. 1992) (child caseworker's testimony that she believed victim's report of abuse improperly bolstered the victim's veracity).

*Commonwealth v. Hagleston*, 308 MDA 2021, 2022 WL 575934, at *4 (Pa. Super. filed Feb. 25, 2022) (unpublished memorandum).[1]

Detective Sherwood did not testify as to whether or not she believed anything the witnesses said. Detective Sherwood offered no personal opinion whatsoever regarding the witnesses' credibility. Instead, Detective Sherwood's testimony that it was difficult to get in contact with these witnesses was Detective Sherwood's perception of the investigative process. We agree with the PCRA court and the Commonwealth that Detective Sherwood's testimony did not impermissibly bolster the witnesses' credibility. Therefore, we conclude Pointer's claim that appellate counsel should have raised an issue challenging this testimony on this basis lacks arguable merit. Accordingly, we discern no error in the PCRA court's dismissal of this claim.

Finally, Pointer argues trial counsel provided ineffective assistance of counsel by failing to object to the portion of the Commonwealth's closing argument stressing the same portion of Detective Sherwood's testimony challenged above.

As explained above, we find the testimony from Detective Sherwood was not improper. Accordingly, emphasizing that testimony during closing argument was not improper.

---

[1] Pursuant to Pa.R.A.P. 126(b), we may rely on unpublished memoranda issued after May 1, 2019, for their persuasive value.

Further, to succeed on an ineffectiveness claim based on trial counsel's failure to object to alleged prosecutorial misconduct, a petitioner must establish that the prosecutor's conduct resulted in the denial of petitioner's constitutional or statutory rights or otherwise denied the petitioner due process. *See Commonwealth v. Koehler*, 36 A.3d 121, 144 (Pa. 2012). "It is well-established that comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in the jurors' minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict." *Commonwealth v. Arrington*, 86 A.3d 831, 853 (Pa. 2014) (citation, internal quotation marks, and brackets omitted).

Moreover,

[a] prosecutor must have reasonable latitude in fairly presenting a case to the jury and must be free to present his or her arguments with logical force and vigor. The prosecutor is also permitted to respond to defense arguments. Finally, in order to evaluate whether the comments were improper, we do not look at the comments in a vacuum; rather we must look at them in the context in which they were made.

*Commonwealth v. Charleston*, 94 A.3d 1012, 1024 (Pa. Super. 2014) (citation omitted); *see also Commonwealth v. Reid*, 259 A.3d 395, 429 (Pa. 2021) ("Even an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks.") (citation omitted). Regarding closing arguments, "a prosecutor may comment on the evidence and any

reasonable inferences arising from the evidence." ***Arrington***, 86 A.3d at 853 (citation omitted).

In ***Reid***, our Supreme Court identified the following test:

[A] prosecutor commits misconduct by improperly bolstering the credibility of a Commonwealth witness when the following two factors are met: (1) the prosecutor must assure the jury the testimony of the government witness is credible, and (2) this assurance must be based on either the prosecutor's personal knowledge or other information not contained in the record.

***Reid***, 259 A.3d at 429 (citation and internal quotation marks omitted). Applying this test, the ***Reid*** Court held that a prosecutor's statement that certain Commonwealth witnesses "told the truth" did not rise to the level of prosecutorial misconduct. ***See id.*** at 430. Although the statement could be interpreted as an assurance that the witnesses' testimony was credible, there was no suggestion that the assurances reflected the prosecutor's personal knowledge or otherwise arose from non-record sources. ***See id.***

Here, the PCRA court concluded trial counsel was not ineffective for failing to object to the prosecutor's statements. The court noted that the prosecutor's arguments were based on the testimony found to have been proper in the above issue. Additionally, the trial court properly instructed the jurors about their role as the judges of witness credibility and that counsel's arguments do not constitute evidence. ***See*** N.T., Jury Trial, Volume II, 11/17/11, at 155-57.

We conclude the PCRA court's findings are supported by the record. We are also unable to conclude that the prosecutor's comments had the

unavoidable effect of instilling bias in the jury such that the jury could not objectively weigh the evidence. Therefore, Pointer's underlying claim lacks merit, and he is not entitled to relief on this issue.

As we find none of Pointer's issues merit relief, we affirm the PCRA court's orders denying Pointer's PCRA petition and correcting the transcript.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

12/2/2025